Good morning, your honors. My name is Stephen Volker. I appear before you today on behalf of Plaintiff and Appellant Western Watersheds Projects. I am here to ask you to reverse the district court. This suit was brought to prevent the needless death and injury of hundreds of desert tortoises, a threatened species. Has the damage already happened? No, your honor. Some of the damage has happened, regrettably. But much of it can be averted in the future. The third unit of this project has not yet been built up. That unit is approximately 1,200 acres. And the US Fish and Wildlife Service, in its June 10, 2011 biological opinion, recommended that BLM reconsider the project and attempt to move the project toward Interstate 15. That is a lower elevation area closer to the Ivanpah Dry Lake Bed, which comprises less attractive habitat or no habitat for desert tortoises, but would be adjacent to Units 1 and 2. So there is a real possibility that this court, by enjoining the continued construction of the project, could redirect its most potentially threatening and needless harm. It could avoid that and redirect the project to an area that would be much better suited for the purposes of the project and to avoid the environmental harm that has ensued. The hallmark of the NEPA cases is that environmental decisions should be made before, excuse me, environmental review should be made before decisions to approve projects that destroy environmental resources are taken. In this case, we have a unique opportunity to prevent both the destruction of the additional acreage, which is, as I've indicated, 1,200 acres in Unit 3, and potentially the 1,100 acres in Unit 2, which comprises unique high elevation habitat required by the desert tortoise as a buffer against the effects of global warming. We have an opportunity to compel the long overdue study of the effects of the thermal technology that's proposed here, which comprises three 460 foot high towers that are boilers where heat is concentrated through the use of 173,000 heliostats, which are garage door sized mirrors. They reflect the sun's heat in a concentrated manner. The focus beams of that energy are sufficiently hot to incinerate birds that pass through the area. There was a pilot project done, a 10 megawatt plant, roughly 1 37th as big as this 370 megawatt plant, done 20 years ago. The crude science employed in that case revealed approximately nine birds killed annually per megawatt. If you scale that up to this project, the harm would be roughly 3,300 birds annually. As you've seen from the declaration of Professor, or rather Dr. Smallwood, the actual take will probably be more than double that because of the lack of appropriate scientific protocols in the earlier study and the fact that when you're dealing with an area that's 50 times larger than the 79 acres in that pilot project, the likelihood that a bird could make it across that scorching field of death is much less. Just like anyone in this room could jump a one foot ditch, no one in this room could jump a 50 foot ditch. That's what we're dealing with in terms of bird death. You may recall the DEIS who pooed bird death. It referred to the McCrary study but didn't provide it or summarize it adequately and said that that study indicated that the mortality of birds in that case was the consequence of a nearby pond, rather than, it used the term rather than, from bird collisions with the mirrors and burns from the focused energy beams. That was simply false. A comment was made that that study should be more thoroughly examined. And the funding IS finally admitted that, yes, there were bird death there. But both BLM and the district court mistakenly assumed that the government was under no duty to use that helpful information, scale it up to the size of this project, and provide the public with meaningful information. What we have here on the- Didn't they have some mitigation measures for that? The mitigation measures were to study mortality after the project is operating. That is- Are there not other things too? Lights and- Not that I'm aware of, your honor. It was, as Dr. Smallwood indicated in his testimony, the measures employed were unlikely to lead to prevention of bird deaths, and were not based on the kind of scientific protocols that were now required in the industry. Well, there may be a disagreement over whether the measures were adequate, excuse me, but my recollection was that there was some effort made to have mitigation to prevent bird deaths, including special kind of lighting and other things. Maybe I'm- Yes, there were about three or four very minor suggestions. For example, that the land not be cleared during bird nesting season, that certain kinds of lighting be employed. This has to do with the other effects that are opposed by this project, not the burning of birds through the focus beams, that's an essential part of this project, nor prevention of collisions. As we've seen from Dr. Smallwood's testimony, burrowing owls, for example, are frequent victims of windows because they are drawn to the reflection. These mirrors are specifically designed to excel at reflection, and when you have 173,000 of them over 5.4 square miles, the likelihood that a bird that's attracted to reflective services will not come in contact with one seems slight. So here we have the two most insidious, if you will, aspects of this project were hidden away from the public's review. Had the public at the outset been given the full facts, that is, that this project is on a site that is inhabited by approximately 2,000 endangered desert tortoises, of which between 405 and 1,136, according to the June 20, 2011 Fish and Wildlife Service biop, this is the revised biop, will be taken either by mortality or injury. That's what we have. The EIS said there might be up to 50 tortoises on site and explained that there's a translocation technology that's available. It didn't explain that at the nearby Fort Irwin, attempt to translocate desert tortoises, over half of the tortoises that were translocated died within the first four years. It didn't explain that if you attempt to translocate over 1,000, or at least many hundreds of tortoises, as we now know, would be required for this facility, that a much, much larger translocation area would be required. In the October, 2010 Fish and Wildlife Service biological opinion, if you add up all the acres, it comes to 3.7 square miles would be required for translocation areas. This is important because the areas where you're going to move the endangered tortoises are shrinking. There are other projects, or at least five of their power projects in the vicinity. And when you translocate, you come into conflict with the tortoises that are already there. As Dr. Small would explain, nature abhors a vacuum. Typically, whatever the density is in those locations is the density that you will get after translocation, i.e. over time, because of the restrictions on the available feed and other habitat conditions, the translocated plus the existing tortoises will eventually drop to the existing tortoise level. So you'll have a complete loss of tortoises. Now, with the new biological opinion, we find that 16.8 square miles will be required for translocation. That's four times as much as the 3.7 square miles that the discerning reader could adduce from the 2010 biological opinion. Council, may I ask a question? Assuming you're right on all that, the district court found both in weighing the equities they did not favor your client, and also that weighing the public interest did not favor your client. And those are pretty determinative in evaluating a motion for a preliminary injunction. So I'm wondering if you could articulate why the district court abused its discretion, and in particular, why it was an abuse of discretion to strongly consider the delay in bringing an action, which she seemed to find weighed heavily in her analysis. All right, well, there are about five factors that were not adequately or were mistakenly considered by the trial court. First, the plaintiff and the public relied on the EIS's statement, there were up to 50 tortoises, and its assurances that translocation, although unproven, would provide an opportunity to move those tortoises out of harm's way. It wasn't until six months later in the biological assessment that was released on April 19, 2011, that the public and Western Watersheds Project was given the information that BLM and Bright Source knew for months that the number of tortoises located onsite was vastly greater than what had been disclosed. They stopped the project at that point to reevaluate, right? And then they started the project again, and you filed your motion for a preliminary injunction after they restarted the project under the supplemental EIS. It was under the second biological opinion, Your Honor. Second biological, okay. The supplemental EIS had come out before this approval had taken place. That's right. But the Local Rule 7.3 of the Southern District requires parties before they file a motion for a preliminary injunction or otherwise to meet and confer. Pursuant to that rule, Western Watersheds Project met with Bright Source Energy in April and May to discuss the new information contained in the April biological assessment. They had that breathing room because the project had been suspended by BLM. The information provided to WWP was that that suspension would likely remain until the biop would be issued, and it was expected to be issued in August. In April and May, meetings were held, or meet and confers were held. Unfortunately, those did not produce a settlement that would provide adequate mitigation for the desert tortoises. On June 10, I believe it was a Friday afternoon, the biological opinion came out without prior notice to plaintiff. It was a very lengthy document. I think it was over 90 pages, single-spaced. It had many references in it. It took the plaintiff at least a week to decide whether or not that analysis was adequate scientifically and whether the mitigations proposed therein were adequate. Did you bring all of this to the district court judge's attention? Yes, yes, both at the hearings and in written submissions to the district court. And so, and there's a declaration from John Marvel, the president of WWP below, which recites the meet and confer efforts that were made. So plaintiff was not lying in the weeds. Plaintiff was doing its level best with no resources, with a pro bono counsel coming down to try to do our best to work with the developer to prevent harm and to avoid needless litigation. That proved unsuccessful. And it was only after the true facts came to light, the inadequacy of the mitigations was established that plaintiff then sought on June 27, a preliminary injunction and temporary screening order. That was denied three days later. Then further briefs were filed. The district court denied the preliminary injunction in August, and I think it was August 10. On August 12, we appealed. August 20, we filed an emergency motion for stay with this court. August 30, this court denied that. So I don't think that one can suggest that the WWP was not diligent. Actually, it followed the rules. It did its level best to prevent harm throughout this process. I'm going to ask you a civil procedure question. I understand Judge Gee has, is it cross motions for summary judgment? That's correct, Your Honor. Would I be, am I right that if she grants one of these or the other, this appeal will be moved because her subsequent judgment will supersede any preliminary injunction? I don't believe so. Now, we argued that at length in our opposition to the motion to dismiss in part because we don't know what Judge Gee might say or when. There's no specific deadline for a decision. Right. I'm assuming that she grants one or the other. She denies them both, and I guess everything stays in place. But if she grants one of the cross motions, wouldn't this be moved? The cases are mixed. We cited a case from this circuit saying that it's not unusual for a preliminary injunction to survive judgments all the way up to the Supreme Court, citing a Supreme Court case where that happened. So it can happen, and I suppose it would happen. No, no. Summary judgment survives. What do you mean? Summary judgment gets appealed, right? I think it goes to what is the appropriate remedy, and if there's a remedy issue, which I suspect there might be, then the remedy might change over time. The remedy today would be different from the remedy in six months. So I don't think allowing more tortoises to be taken or more investment to be made in this project is a sound approach to avoiding needless environmental harm. And all I can say is the cases seem to be divided, Your Honor. I share the court's general view that summary judgment disposes of all the issues. That's the nature of a judgment. But because of the remedy uncertainty, it's not clear to me whether or not a preliminary injunction might survive. The court might maintain it in effect or defer in some ways to it. What do you mean by remedy uncertainty? I mean, I don't understand what you're saying. Suppose the district court judge rolls against you and grants summary judgment to your opposing parties. In that case, are you saying that if we were to decide that she abused her discretion in failing to issue a preliminary injunction, that the preliminary injunction would remain in effect? There are two scenarios. One, that's why there's a provision for motions for injunction pending appeal. Is that if the trial court should rule against WWP, having injunction in place to preserve the status quo pending adjudication of the merits makes good sense. Secondly. That would be a different type of injunction than the one that we're considering here. This is a preliminary injunction. That would be an injunction pending appeal. It would be an appeal on a slightly different record, but much of the record already exists. The alternative scenario is Judge Gee rules in plaintiff's favor, in which case there's a remedy issue as to what parts of the project to enjoin and what additional studies to be conducted. Wouldn't she have to, if she rules in your favor, then she would have to reconsider what type of remedies, and that would be in front of her, not in front of us. That's all something that would be clearer if we had a ruling from her. I would just suggest that if the rule is going to be that, as long as the parties file cross motions for summary judgment, as we did in due course, I believe we filed our opening motion for summary judgment on October 14. So it was hard on the heels of our opening brief in this Court, which was September 23 last year. But what I was to say was, if the rule is that, as long as you're going to file a summary judgment motion, the Court won't entertain motions for injunctions. Kennedy, Judge Silverman didn't say we wouldn't. What Judge Silverman said was, is it correct that if there is summary judgment, that at that point this case would become moot? He didn't say that we – that it will become moot in this case. As you say, maybe it will take two years for Judge Gito to rule on the summary judgment. I apologize. I didn't mean to misinterpret. I – It was just a civil procedure question. But I think the answer is basically, yes, the – that if there were a summary judgment decision issued, it would render this moot and, I think as Judge Wardlow was suggesting, that may well lead to a different motion once you know what Judge G. might order in the way of remedies, or it might lead to a motion for injunction pending appeal. So the record may be the same, and it may not take much doing to do – make that kind of a motion. But as a general proposition, this case would become moot if Judge G., while you're arguing, if she issued a decision which we found out right after your argument, it would likely render the case moot, the disappeal moot. Thank you. Thank you. I'm out of time. May I ask for a one-minute rebuttal? Certainly. Okay. Thank you. And maybe I'll get an A-minus on my civil procedure exam. May I ask how the counsel are going to divide up their time? Yes. Do you plan on dividing your time? We do plan on dividing our time. I plan to take 14 minutes. Fourteen? Yes. Okay. Good morning. May it please the Court. My name is Tekla Hanson-Young, and I represent the United States. With me at counsel's table is Mr. Albert Furlow for Bright Source Energy. And as I said, I will try to watch the clock. I would like to just use my time to respond to a few of the points made by Western Watershed's counsel in his opening statements, and I will comment in reverse order. As to Your Honor's questions concerning the mootness of this appeal, the government's that when the district court enters a final judgment on the cross motions for summary judgment, which could be at any day, then this pending preliminary injunction appeal will be moot, because the district court's order on the preliminary injunction appeal will be merged with its final judgment. Now, that of course assumes that the district court will enter a final judgment on the summary judgment motions. If it doesn't, then this appeal might not be moot, but it should be moot once the district court enters a final judgment, and then Western Watersheds can appeal from that entry of final judgment. That would be the proper course here. And if the district court enters a judgment, we will of course inform this Court of that if the Court hasn't ruled yet. As to Western Watersheds' reasons for not filing a motion for a preliminary injunction until nine months after the project was approved, the reasons have actually changed over time. I haven't read all of the transcripts before the district court, but I'm not aware of Western Watersheds raising this argument that it was meeting and conferring with Bright Source as the reason why it waited nine months before it filed its motion for preliminary injunction. And even if that's true, that would only speak to one of Western Watersheds' claims here, which would be the claim relating to the increased desert tortoise population numbers. As to the rest of Western Watersheds' nine claims, it could have brought that motion for preliminary injunction immediately after the project was approved in October. Instead, it waited until June, nine months later. And this Court has previously held that an eight-month delay in seeking a preliminary injunction is unreasonable and refused to grant the injunction there. The balance of equities, as the district court found, tips sharply in favor of allowing the project to go forward. At this point, Bright Source has spent $1.5 billion. The project is halfway complete. And as BLM explained in the FEIS in the Record of Decision, this project helps the government further its goals to promote renewable energy. It will provide enough power to power 140,000 homes. And it has a lot of ---- If there were a preliminary injunction pending appeal, would that stop the project? If the district court entered final judgment and Western ---- No, I said if there were a ---- if we were to uphold the appeal in this case and issue a preliminary injunction, preliminary injunction pending the district court's ruling, would that bring the entire project to a halt? It ---- I suppose it would depend on the nature of this Court's injunction. But if the Court enjoined the further construction of the project, then the entirety of the project would be at risk. My understanding is that Bright Source's funding is still contingent upon it meeting certain construction-related deadlines. And if the project is inactive or if there's no construction of the project for more than 30 days, my understanding is that some of its funding that it has yet to receive is contingent upon it undergoing construction on a daily basis. Also ---- Is that state or federal funding that you're talking about? My understanding is that it's ---- you know, I'm not exactly sure if it's state or federal. I know that that ---- and perhaps Mr. Furlow can speak to that when he comes up. But the ---- my understanding is that Bright Source is still waiting to receive federal tax credits. And so that would be part of the money that it's still waiting to receive. In addition, if Bright Source is unable to meet its construction deadlines and get online in 2013, it will ---- it's subject to paying financial penalties under its contracts. And so there are ---- Is there any private funding that might be jeopardized if you didn't meet the deadline? That I'm not sure about, and hopefully Mr. Furlow can speak to that as well. What also will be jeopardized is or what would stop, at least in the interim, is the 2,100 jobs that are currently, you know, ongoing. There's 2,100 construction workers currently on the site working right now, and those people would be all out of work if the project weren't joined. And while those people could potentially work again, if the injunction were to be lifted within a certain time frame, it would ---- you know, they would be out of work at this moment. So there would be real harm to those people who are counting on this project for their work. The ---- With respect to Western Watersheds' comments on the merits, Western Watersheds argues that the environmental impact statement needs to be supplemented to address the new information relating to the increased numbers of tortoises on the site. However, Western Watersheds hasn't shown how that information is significant or wasn't analyzed in the original EIS. Simply because there's more tortoises doesn't mean that the impacts will be different from those previously analyzed. And in fact, although the 2011 biological opinion predicted that there would be between 51 and 141 tortoises on the site, to date only 77 adult tortoises have been found, and the entire project area has been swept numerous times, and BLM expects that there will not be any additional adult tortoises found on the project site at this stage. With respect to Western Watersheds' argument relating to the harms to birds that could result from this project, the record indicates that BLM considered the study that Western Watersheds points to in both the reference and explained it in the CEIS and then explained it again in the FEIS, and gave several reasons why it couldn't just multiply the number of birds that were impacted at the site in the study and multiply those out to predict the impacts at this site. There were several reasons why that site in the study were different from the site here. For example, there were large evaporation ponds at that site in the study, and there are no ponds or water on this site. Another difference is that the site in the study, there was poor visibility and there were wires, and those conditions are not present at the current project site. In addition, as Judge Silverman mentioned, there are numerous mitigation measures that would be undertaken to prevent impacts to birds, such as placement of strobe lighting and using downward shielded lighting to help the birds avoid collisions, and also lighting would be turned off when possible. So, and again, Western Watersheds hasn't shown how BLM failed to consider the impacts to birds in the FEIS. The last point I would like to make, and I've sort of touched on this, is that it relates to the status of the project. Again, the project is 50% complete. The only remaining work that needs to be done on the site with respect to impacts to tortoises is about 80% of Unit 3 still needs to have brush cut down. In the brush clearing process on the other units, desert tortoise monitors found four additional juvenile desert tortoises. So there's still a possibility, however small, that when clearing the site again or sweeping the site again before the mowing is completed, the monitors will find some additional juvenile desert tortoises. What happens when they're found? Are they translocated? They're not translocated immediately. They're actually collected and they're tested for disease. If they're too small, they're not tested because they can't take blood from the tortoises at that stage, but they're held in pens that are controlled for temperature. With respect to juveniles, they are held until they reach a certain size, and then they're translocated to areas that can accommodate them. There have been, to date, no deaths of translocated tortoises. Fifty-seven adults have been relocated to date, and there have been no deaths of those tortoises. And, in fact, there have only been two deaths that have been attributable to this project. And the deaths, one of them was a juvenile tortoise that was less than 50 millimeters and it had been run over by a vehicle and it was found later. And another death was caused by, it was to an adult tortoise, and it was caused due to overheating because it had been walking along a silt fence. And there were other reptiles that had been found dead along that silt fence, and then Bright Source was required to change that fence in order to mitigate those impacts that could result from that fence. So as you can see from the record, this project has been carefully thought out and carefully planned to mitigate the impacts to both desert tortoises and birds and, you know, a variety of other critters talked about in the record. It's a good project. BLM thoroughly considered the impacts, gave numerous opportunities to the public to respond, to comment both in the draft environmental impact statement and the supplemental draft environmental impact statement, which considered two additional alternatives. There were many comments in the final environmental impact statement, and even Western Watersheds Project filed a protest, which the record of decision responded to as well. And for these reasons, we ask that the this Court affirm the decision of the district court in denying the request for a preliminary injunction. If there's no other questions, I will rest on our briefs with respect to the remainder of the arguments and leave the remaining time for Mr. Furlow. Thank you, Your Honor. May it please the Court. Al Furlow for Bright Source Energy. I'm going to cover three different topics that I think were raised and sort of referred to me by co-counsel. The financial harm or the issues relating to the finances. The question, there was also a question from Judge Silverman as to whether or not, at the very beginning of the argument, hasn't that harm already happened? I'd like to touch on that, and I also want to touch on the Smallwood Declaration that counsel for plaintiff's appellants has relied upon rather extensively in this argument. As far as the financial situation, financial harm, the financing is a mix of private equity and federal funding. The federal funding is in two different forms. There's a $1.6 billion loan guarantee that's been approved. And there is also at issue an additional $600 million in tax credits that can be awarded to the project. The tax credits are contingent upon the project actually producing energy. It has to be operational before it can recover those tax credits. We expect the project, absent an injunction, absent any unforeseen problem with the actual operational, producing electricity, and sending power to California by July 1 of 2013. All of the units will be online by December 31, 2013. And that would allow, under that schedule, that allows us, Bright Source, to obtain the tax credits in $600 million. What was the date again, I'm sorry? The first unit, Unit 1, comes online on July 1. Construction of that unit, there's actually a 60-day time lag between the completion of the construction of the units and then they're coming online because given the technology and the need to work out all of the software kinks, to have all of the mirrors track the sun accurately so that they're not pointing off in different directions, there's about a two-month time frame after completion of construction for the project to be come up and running. So April would be, April 2013 would be the completion of Unit 1. Will all the power be transmitted to California? Every drop, if I can use mixed metaphors like that. Yes, all of the power goes to either Southern California, SoCal Edison, or PG&E. Nothing to Arizona, huh? Not Arizona. Maybe the next project. Just the last one. Both of those utilities, as is discussed in the briefs, are dependent in part upon the Ivanpah power to meet their requirements under the state RPS requirements. And that's also laid out fairly well, I think, in the state's amicus brief here. Along those same lines, whether or not the harm is complete. The major earthwork, actual large-scale construction activities on the entire site for Units 1, 2, and 3 is done. We've bladed the roads. We've moved the earth that needs to be moved. We've constructed the fences. We've cleared the site of tortoises. Obviously, we're still finding a couple of juveniles because I think the record readily reflects that those juveniles are hard to find. And in the surveys, going into our tortoise clearance surveys, the expectation was you weren't going to find any juveniles. And in fact, the assumptions made in the biological opinions is that you're not going to find the juveniles. Well, we were successful in finding about 60 or so juvenile tortoises during our clearance process. Those have all been moved into the holding pens. It's called the Head Start program because those tortoises that are found, those juvenile tortoises, will be raised for approximately five years in those pens so that when they're released back out into the surrounding area, they'll be of a size that they'll be capable of fending off to the extent tortoises can fend off the predators that would otherwise prey on the juveniles. We also found a bunch of tortoise eggs as we were doing the clearance surveys. Those were preserved, taken. Many of them hatched, and there were about 50 or so tortoises that hatched from the eggs that we found on the site. So right now, there's a few over 100, around 106 or 107 of the juvenile tortoises in the Head Start that will be raised for five years. The site itself has, with the three units, the power towers, the 450-foot towers in the middle of each of the units, are built. Unit three might be 99 percent complete, but effectively, that construction is over. The roads leading to those towers are over. The ring roads that are needed to install the pylons are installed. That work has all been done. What's left to be done is the mowing, which, quite honestly, could have been done, but there's no need to do it in advance of it needing to be done. But there's nothing that stopped us from actually going out and just mowing the vegetation that needs to be mowed. If it's all done, what harm would the injunction do? Well, it depends upon what the injunction says, but plaintiff's injunction, plaintiffs were seeking to stop all construction activities on the site. Stopping all construction activities on the site until the district court enters a decision on the cross motions for summary judgment or, assuming at that point in time, the injunction would be over. The construction workers would be sent home. I would hope that we would be continued to allow to care for the tortoises that are being held in the pens. We still have 17 adult tortoises that we hope to be translocating in the fall. But the construction would stop. What precisely would stop? Suppose we were to reverse the district court. Well, right now it would stop the installation of heliostats. We have about 50,000 of the 170,000 installed. It would stop the further installation of the pylons in Unit 3. There are about 60,000 or 70,000 pylons I think we've already put in. The numbers change every day. Let me ask you this question in a slightly different way. Okay. What would be stopped by issuance of a preliminary injunction now that could cause harm to the turtles? I think we're here to see. I would say nothing, Your Honor. Nothing that's going on now. So would the mowing? The mowing could be stopped, but the question is whether or not that harms the tortoises. I mean there are no tortoises on the site that could take advantage of that vegetation at this point. We would, in advance of the mowing, we send out. How sure are you, how certain are you that there are no tortoises on the site? Well, I was just getting to that. As we go out and do the mowing, you literally have biologists walking in front of the mowers looking for tortoises that may have been overlooked, generally the juveniles. We have not found another adult tortoise on the site since it was cleared in October of 2010. We have found six juveniles on all three of the sites combined. But we would go in front as we're required to under the biological opinion and basically search that ground in advance of the mowing taking place. The mowing would then cut the vegetation to between 12 and 18 inches off the ground. But that vegetation exists. If you can imagine each unit being a square, and within each square there would be concentric circles centered on the tower, which is in the middle of the square. There are roads built for the installation of the pylons. The pylons are installed from the roads by a crane that reaches over and pounds them into the ground. One of the aspects of this project that I think makes it somewhat unique is that it's designed as a low-impact development. We don't go in and blade the entire 4,000 acres. The only area that's affected is the area that we need to access where the pylons go. We've built a central logistics area, it's called, of several acres where the control buildings are. We have on-site manufacturing of the heliostats. We combine them to the electronics and then put them out on the posts. That's all done on-site. But it's designed to allow the water, when it comes, to wash through the desert washes. And the vegetation is not just all stripped from the land, it's still there. I think we've run out of time, Counsel.  Thank you. Your Honor, I've made five points I'd like to respond to very quickly. First, the reply declaration of John Marvel, filed July 25, 2011. It's District Court Docket 85-3. Paragraphs 4 through 6 explains the meet and confer that transpired and the circumstances. If I had more time, I'd read from it, but it's directly responsive to the question. Second, the suggestion that only 77 adult tortoises have been found on-site and, therefore, there's really no concern that there might be other tortoises there is refuted by the record. The biological opinion issued June 10, 2011 states, and this is at ER 4325, that the Fish and Wildlife Service predicted 84 adults, 860 juveniles. That's in age classes from hatchling, which is up to one year, through ages 19 or 20, which is when adulthood or procreation is achieved. So we had roughly 20 years of so-called juveniles, numbering about 860 expected to be on-site. Of those by the government's own admission, only 60, or less than 10%, have been found. The problem is that the smaller creatures simply aren't seen, and they are killed. Some do survive. Additionally, 434 hatchlings were expected by the Fish and Wildlife Service. Additionally, the Fish and Wildlife Service at ER 4338 explained they predicted that BrightSource would find 44% of the individuals between 120 and 160 millimeters, but a far smaller proportion for hatchlings and individuals from hatchling size to 120 millimeters. Again, this is the biological opinion. This reflects the considered judgment of the government's expert agency in this area, and it clearly shows the harm that is caused by continuing to proceed with this project. The next point I'd like to respond to is it was suggested that this project is needed to achieve California's RPS goals. We have an engineer who refuted that at the trial court at ER 219 to 225. Mr. Powers explained that we already have approved ample renewable energy projects to satisfy the RPS goals. So this project could be put on pause. The studies could be done. Harm could be minimized, and we would still meet all of our RPS goals, including rooftop solar. The last point is there was suggestion there would be no further harm from this project. That's not correct. The grading and vegetative mowing that would be conducted in Unit 3 would kill tortoises. There's ample evidence of that, either through direct habitat loss or because they're going to be hit with the blades or crushed under the tires. Additionally, construction of additional heliostats will harm birds. We were told 50,000 heliostats have been installed today. That leaves 120,000-plus to be installed in the future. So much environmental harm is still underway and could be prevented through adequate environmental review. Thank you very much. Thank you, counsel. Case to argue will be submitted. Court will stand to recess for the day.
judges: Reinhardt, Silverman, Wardlaw